UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DUANE LARSON, on behalf of himself and others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No: 05 C 3268 |
| BURLINGTON NORTHERN SANTE FE RAILWAY COMPANY and TRANSPORTATION COMMUNICATIONS INTERNATIONAL UNION, | ) ) ) ) ) | Judge John W. Darrah |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

The Plaintiff, Duane Larson, on behalf of himself and others similarly situated, filed a one-count Complaint against the Defendants, Burlington Northern Sante Fe Railway Co. and the Transportation Communications International Union, alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* Currently before the Court are Cross-Motions for Summary Judgment.

## BACKGROUND

The facts in this case are not in dispute; the parties have submitted a Joint Stipulation of Facts. A history of mergers in the railroad industry over the past several decades and the merger agreements, among the railroads and the unions subject to federal regulatory approval, are at the center of this case.

1

On March 3, 1970, the Northern Pacific, the Great Northern, and the Chicago, Burlington and Quincy Railroads merged to form the Burlington Northern Railroad ("BN"). (Joint 56.1 Facts at ¶ 2). The merging railroads and the Transportation Communications International Union ("TCU") entered into an agreement, referred to as the "White Book," which the Interstate Commerce Commission[1] imposed as part of its approval of the merger. (Id. at ¶ 3). In 1980, the BN merged with the St. Louis and San Francisco Railroad. In connection with this merger, the merging railroads and the TCU entered into an agreement, known as the "Blue Book." (Id. at ¶ 4). The White and Blue Books allowed the railroads to terminate or reassign positions and move employees to job sites in distant locations but provided displacement allowances, and other benefits, to affected employees. (White and Blue Books).

The White Book provided that employees would be entitled to protections contained in the 1936 Washington Job Protection Agreement ("WJPA"), which required payment of displacement allowances and benefits to employees adversely affected by a merger transaction. (Joint 56.1 Facts, Ex. A, §§ 3-4). Under the WJPA, as modified by the White Book, employees were guaranteed a monthly average (sometimes called a protective rate of pay) based on their positions at the time of the merger. In exchange, those employees were required to exercise their seniority rights to take the highest paying available position within a defined district (known as a "seniority district"), even if the new position required a change in residence. (Joint 56.1 Facts,

---

[1] Prior to 1995, the ICC had primary responsibility for approving mergers within the railroad industry. In the fall of 1995, Congress passed legislation to eliminate the ICC, and to transfer the ICC's oversight of the rail corridor abandonment process to a new entity, the Surface Transportation Board ("STB") within the U.S. Department of Transportation. Under the ICC Termination Act, the STB now has exclusive jurisdiction to examine, condition, and approve mergers and consolidations of railroads. 49 U.S.C. § 11321.

2

Ex. A, § 3). However, if an employee could not obtain any position that paid as much or more than the protective rate of pay, then he or she would be entitled to an allowance equal to the difference between the rate of pay of the position held and the guaranteed rate. This amount is referred to in the WJPA as a "displacement allowance." (Joint 56.1 Facts, Ex. K, §§ 6(a), (b), & (c)). Moreover, if an employee could not obtain any position within the seniority district, then he or she was entitled to draw protective pay even while not working at all. (Joint 56.1 Facts, Ex. A, § 1(b)(1)).

The mergers continued – in 1995, BN and the Atchison, Topeka & Santa Fe Railroad merged. (Joint 56.1 Facts at ¶ 5). In connection with this merger, the two Defendants in this case – the merged railroads, BNSF Railway Company ("BNSF"), and the TCU – entered into an agreement, known as the Master Implementing Agreement ("MIA"). On November 30, 2005, the TCU wrote to its members, describing the proposed MIA. (Joint 56.1 Facts, Ex. D). The MIA was voted on by the TCU members and ratified. (Joint 56.1 Facts, ¶ 7). It went in effect on December 19, 1995. (Joint 56.1 Facts at ¶ 5).

The MIA modified the protections and requirements imposed by the White Book. For White Book employees, the MIA added enhanced protection from forced relocation; they were only required to accept positions within thirty miles of home. (Joint 56.1 Facts, Ex. D at Art. V). However, the MIA provided that White Book benefits would end when the employee became eligible for unreduced annuity under the Railroad Retirement Act, i.e., after reaching thirty years of employment and sixty years of age. (Joint 56.1 Facts, Ex. D at Art. V(a)). The MIA left unchanged the Blue Book provisions that allowed for lifetime benefits but that also required that an employee could be obligated to work in a position within his designated seniority district,

3

even if it required a change in residence within a four-state area. (Blue Book, Art. IV, §§ 1(b) and (c)). Under the MIA, White Book employees, like the Plaintiff, were offered a choice between electing either: (1) the White Book relocation protection benefits for a circumscribed time period or (2) the Blue Book protections, which were unlimited in duration but conditioned on potential relocation within the four-state seniority district at the election of the employer. (Joint 56.1 Facts, Ex. G, MIA Sideletter at 21).

An Open Election period ran for sixty days from the date that the notice was posted. (Joint 56.1 Facts, Ex. G, MIA Sideletter at 21). On January 5, 1996, BNSF posted a notice to "All Active Orange, White and Blue Book Protected Clerical Employees" concerning Side Letter No. 2. (Joint 56.1 at ¶ 8). The election period agreed to under Side Letter No. 2 was sixty days. (Joint 56.1 Facts, Ex. D, at 20). However, the election period was later extended to give White and Orange Book employees an additional opportunity to choose Blue Book coverage. (Joint 56.1 Facts, Ex. H). Another notice was posted for all employees, advising them that they had until May 28, 1996, to make an election and warning that anyone who did not submit an election form would be deemed to have elected Orange or White Book protections. (Joint 56.1 Facts, Ex. H). There was a third opportunity for employees to elect Blue Book coverage – the railroad and the union provided yet another sixty-day election period, commencing September 30, 1996. (Joint 56.1 Facts, Ex. L). During 1996, a number of Orange and White Book-protected employees elected to accept Blue Book protection, while others made no such election and thereby retained their Orange or White Book protections. (Id. at ¶¶ 9, 12).

The Plaintiff, Duane Larson, began employment at Defendant BNSF in 1967 at age 22. (Joint 56.1 ¶ 1). The Plaintiff is a White Book employee. (Id. ¶ 11). The Plaintiff never made an

4

election to receive protections under the Blue Book and thereby remained covered by the White Book. (Id. ¶ 12). During the entire period of his employment, he was represented by Defendant TCU. (Id.). During all relevant times, the Plaintiff was employed in Seniority District 2, the Northern Seniority District, which encompasses Montana, North Dakota, South Dakota and Minnesota. (Suppl. Joint 56.1 ¶ 3).

Larson obtained age sixty on January 7, 2004, and had more than thirty years of service. (Id. ¶ 15). As a result, he was eligible for an unreduced annuity under the Railroad Retirement Act. (Id. ¶ 14). However, he continued to work and receive regular wages as a crew hauler at BNSF's facility in Dilworth, Minnesota; but White Book job protection wages were discontinued pursuant to the MIA.

Between March 1970 and January 2004, Larson received his regular wages from BNSF. In addition, during this period, Larson received job protection wages from BNSF in varying amounts between $0 and $757.89 per month. (Id. ¶ 13). Each job protection wage to Larson was made along with his regular wages in a single aggregated paycheck for the pay period.

On September 24, 2004, Larson filed a charge with the EEOC against both the TCU and BNSF. (Id. ¶ 17). The charge against BNSF alleged the following: "From February 2004 to date, the Respondent has continually paid me approximately $400.00 per month less than I was earning before my [60th] birthday. . . . I believe the Respondent is discriminating against me because of my age, 60, in violation of the Age Discrimination in Employment Act, as amended, because of its merger." (Joint 56.1 Facts, Ex. J). The EEOC granted Plaintiff a right to sue on March 1, 2005. (Joint 56.1 Facts at ¶ 17). Plaintiff filed this action on June 2, 2005.

## LEGAL STANDARD

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (*Celotex*). All of the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001) (*Greer*).

## ANALYSIS

The Seventh Circuit has rejected the idea that it is discrimination to offer employees an elective choice of age-related benefits. *See, e.g., Cerutti v. BASF Corp.*, 349 F.3d 1055 (7th Cir. 2003); *Robinson v. PPG Indus., Inc.*, 23 F.3d 1159 (7th Cir. 1994); *Henn v. National Geographic Society*, 819 F.2d 824 (7th Cir. 1987). In those cases, the court found that so long as "the employee may decline the offer and keep working under lawful conditions," the ability to select early retirement makes the employee better off. *Henn*, 819 F.2d at 826.

The Plaintiff asserts that these cases are not controlling; the Plaintiff's argument is not persuasive. Here, the end of the Plaintiff's benefits was a direct consequence of his own voluntary choice under Side Letter No. 2 of the MIA. It is not unlawful to give employees a choice of benefits, even if one of the options is correlated to age, provided, however, that the

choice is among lawful alternatives. Here, the Plaintiff's choices were lawful alternatives. *Solon v. Gary Comm. Sch. Corp.*, 180 F.3d 844, 849-52 (7th Cir. 1999). Thus, whether or not the choice offered to the Plaintiff, and others similarly situated, was voluntary must be determined.

The voluntariness question involves factors, such as: "[D]id the person receive information about what would happen in response to the choice? [W]as the choice free from fraud or other misconduct? [D]id the person have an opportunity to say no?" *Henn*, 819 F.2d at 828. Additionally, if the Defendant only offered a short time period in which to make the election, it "may show that the person could not digest the information necessary to the decision." *Henn*, 819 F.2d at 829.

Here, the Plaintiff was given specific information about what would happen in electing either White Book or Blue Book coverage. On November 30, 1995, the TCU issued a letter to its members regarding the election. It later issued the "TCU/BN Members' Guide to the BNSF Master Implementing Agreement," a twenty-four page document which detailed the choices. On January 5, 1996, BNSF posted a notice concerning Side Letter No. 2. (Joint 56.1 at ¶ 8). The Plaintiff was given sixty days in which to make the election to stay with the White Book benefits or to take the Blue Book benefits. In *Henn*, the employer, National Geographic Society, decided to reduce the number of employees selling ads. Thus, the employer offered every ad salesperson over the age of fifty-five the option of early retirement. The employer allowed the qualified salespeople more than two months to consider the offer. The employer offered "a severance payment of one year's salary, retirement benefits calculated as if the retiree had quit at 65, medical coverage for life as if the employee were still on the payroll, and some supplemental life insurance coverage." *Henn*, 819 F.2d at 826. The employees who rejected this one-time offer were allowed

to remain employed, although they gave up the benefits that the employer offered. *Id.* Here, the Plaintiff never faced discharge if he did not accept the new White Book protections. Rather, the Plaintiff faced three choices: (1) After he reached age sixty, he could receive displacement protection and be willing to relocate anywhere in a four-state area; (2) up to age sixty, he could receive displacement protection and not substantially relocate for work and then retire at age sixty and receive retirement benefits; or (3) after age sixty, he could not receive displacement protection – i.e., work for a lower wage – and not retire.

There is no evidence of fraud or other misconduct. Thus, what it comes down to is the fact that the Plaintiff (and others similarly situated) were faced with a difficult decision. However, the "high value of each option hardly calls the voluntariness of the choice into question." *Henn*, 819 F.2d at 829. For eight years, the Plaintiff enjoyed the additional benefits flowing from his choice to retain White Book coverage, which only required him to accept positions within thirty miles of his home. This does not constitute discrimination; rather, it is a "benefit to the recipient, not a sign of discrimination." *Cerutti*, 349 F.3d at 1062.

*ADEA Safe Harbor Provision and Timeliness*

The Defendants further argue that the Blue Book protections do not violate the ADEA because the ADEA provides a safe harbor even for otherwise-prohibited actions taken "to observe the terms of a bona fide seniority system that is not intended to evade the purposes of this chapter . . . ." 29 U.S.C. § 623(f)(2)(A). Further, the Defendants allege that the Plaintiff's claims are untimely. However, these arguments need not be addressed in light of the above holding.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment is granted. The Plaintiff's Motion for Summary Judgment is denied.

Dated: June 20, 2006

JOHN W. DARRAH
United States District Court Judge